IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Criminal No. 2:16-CR-053-D(2) |
| | § | |
| JOSE EMMANUEL MORALES | § | |
| RITTINGGER, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

Defendant Jose Emmanuel Morales Rittingger ("Rittingger") moves to suppress all evidence—18 bundles of a substance believed to be heroin, and $10,080 in U.S. Currency—seized on August 15, 2016, following the stop of a vehicle in which he was a passenger.  Following an evidentiary hearing, and for the reasons that follow,[1] the court denies the motion.

I

On August 15, 2016 Texas Department of Public Safety ("DPS") trooper Michael Francis ("Trooper Francis") was parked facing eastbound on the shoulder of Interstate Highway 40 in Potter County, Texas, near milepost 79, when he observed in his rearview mirror a black 1995 BMW ("BMW") in the left lane.  The BMW had passed a posted "Left Lane for Passing Only" sign less than one mile before reaching the point on the interstate

_____

[1]Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

highway where Trooper Francis first observed the BMW.  Trooper Francis credibly testified that the BMW came out of a turn in the interstate in the left lane and remained in the left lane.  The BMW driver did not appear to be using the left lane for passing.  The BMW remained in the left lane for approximately 10 to 12 seconds after passing Trooper Francis' parked vehicle.  Trooper Francis also observed that a GPS device holder was attached to the windshield next to the driver's head.

Trooper Francis pulled his marked DPS vehicle onto the interstate and began to pursue the BMW.  After he caught up to it, he drove beside the BMW to verify that the occupants were wearing seat belts.  When he did, he observed the GPS device holder and could see that it was restricting the driver's view.  Although the GPS device was moved sometime between when Trooper Francis made this observation and the BMW came to a stop, the device holder was closer to the driver's head when Trooper Francis first observed it.  Trooper Francis stopped the BMW based on two suspected violations of Texas law: driving in a left lane reserved for passing, and driving with an obstructed view.

Trooper Francis has been a Texas state trooper for a little more than three years and has prior law enforcement experience that includes four years as a county deputy sheriff.  He has received training in the seizure of narcotics, including what signs to look for.  His record includes 85 narcotics stops, and he has received awards for narcotics seizures.  The Interstate 40 area in Potter County, Texas that Trooper Francis was patrolling on August 15, 2016 is a high volume drug corridor, and he has stopped numerous vehicles in this area.

After effecting the stop of the BMW, Trooper Francis observed that the vehicle bore

an Illinois license plate.  He ran the plate and the vehicle came back as registered to someone named Leonardo Rodriguez.  Trooper Francis observed that the BMW was a 1995 model that had been recently painted and buffed.  This caught his attention because the BMW had salt water damage, and there did not appear to be a good reason to repaint the vehicle.  Trooper Francis also observed that the driver of the BMW kept his foot on the brake pedal for some time after the vehicle stopped, and that the driver and passenger both exited the vehicle before he approached it.  The driver also left his door open despite the fact that the vehicle was stopped adjacent to an interstate highway.  In his experience, these actions are indicators of nervousness.

Trooper Francis first made contact with the driver, later identified as defendant Joel Lara Merida ("Merida"), and then with the passenger, later identified as Rittingger.  Trooper Francis informed Merida and Rittingger of the reason for the stop and asked Merida in English for his identification and proof of insurance.  Merida responded that he did not speak English, so Trooper Francis asked Merida in Spanish for his identification and proof of insurance.  Merida provided Trooper Francis an insurance card that showed that the vehicle was insured by Leonardo Rodriguez of Elgin, Illinois.  When Trooper Francis asked Merida whom the car belonged to, both Merida and Rittingger responded in Spanish that they had both bought the car.  The fact that the car was titled and insured in the name of a third party was noteworthy to Trooper Francis because it is common for drug traffickers to rent a car or use a third party vehicle to transport narcotics.

Trooper Francis asked Merida where he was headed, and Merida responded that they

were traveling to Dallas.  Merida also stated that he had worked as an immigration official in Mexico for eight years.

Trooper Francis informed Merida that he was only going to issue a warning for the traffic violations, and he asked Merida to have a seat in the patrol vehicle.  Trooper Francis then asked Rittingger for his identification.  Rittingger provided a Mexico driver license and informed Trooper Francis that he and Merida were traveling from El Paso to Dallas.

Before Trooper Francis returned to his patrol vehicle, Merida approached Trooper Francis and opened his wallet to display the cash it contained.  Trooper Francis considered this to be another nervous indicator because it suggested that Merida might be attempting to bribe him, and it showed that Merida had something else on his mind.

Trooper Francis then ran Merida's and Rittingger's Mexico driver licenses to check for outstanding warrants.  Because the driver licenses were issued by Mexico, it was necessary that he enter the information into his computer manually, which took longer. While he was doing this, Rittingger opened the passenger door of the BMW, stepped out of the vehicle, and acted restlessly and suspiciously as he stood next to the BMW looking at Trooper Francis' patrol vehicle.  Trooper Francis considered this to be a nervous indicator for a passenger to exit a stopped vehicle; normally, passengers do not get out of cars during a traffic stop made by law enforcement.

Inside the patrol vehicle, Trooper Francis asked Merida where he and Rittingger were going.  Although Merida's English was a little broken, Trooper Francis could understand him.  Merida said that he and Rittingger were going to Oklahoma and then to Dallas.  This

was inconsistent with what Rittingger had said.  Rittingger told Trooper Francis that they were traveling from El Paso to Dallas.  Merida never mentioned El Paso, and Rittingger never mentioned Oklahoma.  Trooper Francis testified that it is common for narcotics couriers not to know the origin or destination of their trip, i.e., not to know at least one end of the trip.

Because Trooper Francis was already suspicious that something was going on, he contacted DPS trooper Max Honesto ("Trooper Honesto"), who is fluent in Spanish, so that Trooper Honesto could speak to Merida and Rittingger by telephone regarding the finer details of their trip.  The conversation on a speakerphone in Trooper Francis' patrol vehicle was captured on the video of the stop.  Merida told Trooper Honesto that he had bought the BMW in New Mexico, but that he was unsure of the name of the city; that he was a bartender (whereas before he had said that he was an immigration official in Mexico); that he and Rittingger were going to go shopping, and, afterwards, he was going to return to Mexico by plane while Rittingger stayed with his family in the United States; and that they were going to Oklahoma to get something to eat.  Rittingger told Trooper Honesto that they were coming from El Paso (he did not mention New Mexico) and were headed to Reynoso, Mexico; that he did not have family in Oklahoma; and that he was in real estate in Mexico.  When Trooper Honesto asked Rittingger why they were off track, Rittingger said that the GPS had taken them on this route and that it was "too dangerous" to travel the regular route.  Trooper Honesto relayed to Trooper Francis what Merida and Rittingger had told him.  Trooper Francis found a number of things to be suspicious, including inconsistencies between the

stories being told by Merida and Rittingger; the fact that they were traveling to Oklahoma, which was out of the way if their intended destination was Dallas, and that Reynosa, Mexico was off track; and that Rittingger had referred to a regular route that was "too dangerous."

After hanging up the telephone with Trooper Honesto, Trooper Francis informed Merida that he would be issuing warnings for both traffic violations, with no fines, fees, or penalties, and no traffic ticket. Trooper Francis printed the warning using a printer in his patrol vehicle and asked Merida to sign a copy. After Trooper Francis returned all of Merida's documents to him, he asked Merida if there were any drugs in the car, specifying marihuana, heroin, and cocaine. Merida responded that there were not.

Trooper Francis then pointed to the BMW, and, in Spanish, asked Merida for permission to search the car. *See* D. Ex. 1 at 13 ("Permiso buscar?"). Trooper Francis testified credibly that Merida nodded when Trooper Francis pointed to the car. Merida responded verbally, in Spanish, "oh no, yes." *Id.* Following a short exchange, Merida said, in Spanish, "I don't understand." *Id.* at 14. Trooper Francis responded, in Spanish, "Me search," *id.*, and then clarified, in Spanish, "search, search, permission to search," *id.*, and, in English, "like search the car," *id.* Merida responded, using English and Spanish words, "Oh yeah, yeah, yeah, the luggage, to open the luggage?" *Id.* Trooper Francis responded "yeah," and Merida replied, "Okay, okay, okay." *Id.*

Trooper Francis then advised the dispatcher that he would be out of his patrol vehicle on a consent search, and he began to search the BMW. Merida never expressed surprise that Trooper Francis was searching the BMW, informed Trooper Francis that he had not given

- 6 -

consent to search, or asked him to stop.  When Merida pleaded guilty on November 16, 2016,

he admitted in his factual resume that "Trooper Francis asked [him] for consent to search the

vehicle and [he] voluntarily consented to the search."  Gov't Ex. 2 at 2.[2]  Rittingger likewise

did not ask Trooper Francis to stop searching the BMW.  Both Merida and Rittingger were

able to walk about freely as Trooper Francis conducted the search.

During the search, Trooper Francis located a hidden compartment behind the rear seat

of the BMW.  Based on his training and experience, he knew this secret compartment could

be used to smuggle narcotics and currency.  As Trooper Francis was about to access the

compartment, Rittingger gave a hand signal to Merida, but neither of them asked that

---

[2]At the hearing, Rittingger objected to the admissibility of Gov't Ex. 2, and to the court's reliance on Merida's factual resume, on two grounds: first, that Merida's factual resume is hearsay, and, second, that Merida was not called as a witness at the suppression hearing, thereby violating Rittingger's right to confront a witness against him.  The court overruled both objections.  It overruled the first because the Federal Rules of Evidence do not apply to a suppression hearing.  *See* Fed. R. Evid. 1101(d) ("These rules—except for those on privilege—do not apply to the following: (1) the court's determination, under Rule 104(a), on a preliminary question of fact governing admissibility[.]").  The court overruled the second, subject to reconsidering the objection following the hearing, on the basis that it was unaware of any controlling authority that applied *Crawford v. Washington*, 541 U.S. 36 (2004), to a motion to suppress.

The court now concludes that *Crawford* and its progeny do not preclude the court from relying on statements in Merida's factual resume when determining whether his consent to search was voluntarily given.  Although the Supreme Court held in *Crawford* that the Confrontation Clause bars the admission of "testimonial statements" made by a non-testifying witness—unless the witness is unavailable and the defendant had a prior opportunity to cross-examine him, *id.* at 59—neither the Supreme Court nor the Fifth Circuit has ever held that the right to confrontation applies to pretrial proceedings.  *See United States v. Morgan*, 505 F.3d 332, 338 (5th Cir. 2007) (noting that "the Fifth Circuit has not decided whether *Crawford* applies to pretrial proceedings and determinations").  Absent controlling authority that *Crawford* applies to a suppression hearing—in which the overall question is whether challenged evidence is admissible at trial—the court holds that it does not apply.

Trooper Francis stop his search.   After Trooper Francis gained access to the hidden compartment, he located aluminum and black tape wrapped bundles.  He immediately placed Merida and Rittingger under arrest (Merida initially slapped the handcuffs out of Trooper Francis' hands), and the BMW was transported to the DPS office in Amarillo, Texas.  Once there, agents located 18 bundles that field-tested positive for the presence of heroin and had a gross weight of 44.26 pounds, and $10,080 in U.S. Currency.

During an interview, Rittingger informed Drug Enforcement Administration ("DEA") agent Marcos Fabela ("Agent Fabela") that the Mexican Cartel had given him the BMW in New Mexico and had instructed him to drive the car to Chicago and await further instructions.  Merida and Rittingger were charged in a one-count indictment with the offense of possession with intent to distribute 1 kilogram or more of heroin and aiding and abetting, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(i), and 18 U.S.C. § 2.  Merida has pleaded guilty and has not moved to suppress the evidence seized as a result of the traffic stop.

Rittingger moves to suppress the evidence—18 bundles of a substance believed to be heroin, and $10,080 in U.S. Currency—seized during the search of the vehicle.  The government opposes the motion.[3]

---

[3]The government maintains that, as a passenger, Rittingger does not have standing to challenge the search of the vehicle.  Because the court need not decide whether Rittingger has standing, it will assume *arguendo* that he does.

II

The Fourth Amendment protects individuals against unreasonable searches and seizures. "The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). Evidence derived from an unreasonable search or seizure generally must be suppressed under the "fruit-of-the-poisonous-tree doctrine." *United States v. Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015) (citing *United States v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013)). "Warrantless seizures are 'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Id*. (quoting *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014)). One such exception comes from *Terry v. Ohio*, 392 U.S. 1 (1968).

The framework articulated in *Terry* is used to analyze the legality of a traffic stop. "Under the two-part *Terry* reasonable suspicion inquiry, [the court asks] whether the officer's action was: (1) 'justified at its inception'; and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005) (quoting *Terry*, 392 U.S. at 19-20). Although "[a] defendant normally bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional[,] . . . where a police officer acts without a warrant, the government bears the burden of proving that the search was valid." *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citations omitted). Accordingly, "[t]he government bears the burden of establishing by a preponderance of the

- 9 -

evidence [the] two elements under *Terry*[.]"   *United States v. Johnson*, 2006 WL 1041148,

at *3 (N.D. Tex. Apr. 20, 2006) (Fitzwater, J.) (citing *United States v. Sanchez-Pena*, 336

F.3d 431, 437 (5th Cir. 2003); *United States v. Riley*, 968 F.2d 422, 424-25 (5th Cir. 1992)).

## III

The government has established by a preponderance of the evidence that the traffic

stop was justified at its inception.

### A

"A temporary, warrantless detention of an individual constitutes a seizure for Fourth

Amendment purposes and must be justified by reasonable suspicion that criminal activity has

taken or is currently taking place; otherwise, evidence obtained through such a detention may

be excluded."   *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013). "Reasonable

suspicion requires more than merely an unparticularized hunch, but considerably less than

proof of wrongdoing by a preponderance of the evidence." *Id.* (internal quotation marks and

citation omitted).  As this court has previously explained:

> For a traffic stop to be justified at its inception, an officer must
> have an objectively reasonable suspicion that some sort of
> illegal activity, such as a traffic violation, occurred, or is about
> to occur, before stopping the vehicle.  The Supreme Court has
> stated that in making a reasonable suspicion inquiry, a court
> must look at the totality of the circumstances of each case to see
> whether the detaining officer has a particularized and objective
> basis for suspecting legal wrongdoing.   We have stated
> previously that reasonable suspicion exists when the officer can
> point to specific and articulable facts which, taken together with
> rational inferences from those facts, reasonably warrant the
> search and seizure.   In evaluating the totality of the
> circumstances, a court may not consider the relevant factors in

> isolation from each other.  In scrutinizing the officer's basis for
> suspecting wrongdoing, it is clear that the officer's mere hunch
> will not suffice.  It is also clear, however, that reasonable
> suspicion need not rise to the level of probable cause.

*Johnson*, 2006 WL 1041148, at *3 (quoting *Lopez-Moreno*, 420 F.3d at 430).

B

The government contends that Trooper Francis was justified in stopping the BMW on the basis that Merida was driving in a left lane reserved for passing and was driving with an obstructed view.  When Rittingger filed his motion to suppress, he did not dispute that Trooper Francis had an initial justification for the traffic stop.  *See* D. Br. 2 ("the Defendant does not dispute the probable cause to stop for the alleged traffic offense, the only question is whether the stop was otherwise executed in a reasonable manner.").  But at the commencement of the suppression hearing, Rittingger stated that he was challenging the initial stop itself on the basis that Trooper Francis "lacked probable cause" to stop the BMW. For the reasons that follow, the court finds and concludes that Trooper Francis had reasonable suspicion to effect the traffic stop of the BMW.

Left-lane driving is regulated via the sign-compliance provision of the Texas Transportation Code:

> (a)   The operator of a vehicle . . . shall comply with an
> applicable official traffic-control device placed as provided by
> this subtitle . . .
> (b)   A provision of this subtitle requiring an official traffic-
> control device may not be enforced against an alleged violator
> if at the time and place of the alleged violation the device is not
> in proper position and sufficiently legible to an ordinarily
> observant person.

- 11 -

Tex. Transp. Code Ann. § 544.004.[4]  "For a driver in the left lane to violate the sign-compliance provision, he must have notice, i.e., there must be a sign 'within a reasonable distance of the traffic stop.'"  *United States v. Castillo*, 804 F.3d 361, 365 (5th Cir. 2015) (quoting *Abney v. State*, 394 S.W.3d 542, 548 (Tex. Crim App. 2013)).  An officer is not required, however, to have *specific* knowledge that the suspect passed the sign.  *Id.* at 366 ("To conclude that an officer does not have reasonable suspicion unless he knows the defendant passed the sign is essentially to require *certainty* that a violation occurred.  This would raise the standard for reasonable suspicion far above probable cause or even a preponderance of the evidence, in contravention of the Supreme Court's instructions." (citing *Naverette v. California*, ___ U.S. ___, 134 S.Ct. 1683, 1687 (2014))).

At the suppression hearing, the government introduced evidence that the BMW had passed a "Left Lane for Passing Only" sign less than one mile before reaching the point on the interstate highway where Trooper Francis first observed the BMW, and Rittingger presented no evidence to the contrary.  Trooper Francis credibly testified that the BMW came out of a turn in the interstate in the left lane and remained in the left lane.  The BMW driver did not appear to be using the left lane for passing.  The BMW remained in the left lane for

---

[4]In its brief, the government contends that driving in the left lane while not passing violates Tex. Transp. Code Ann. § 544.011.  That provision, however, merely states that "[i]f, on a highway having more than one lane with vehicles traveling in the same direction, the Texas Department of Transportation or a local authority places a sign that directs slower traffic to travel in a lane other than the farthest left lane, the sign must read 'left lane for passing only.'"  The court assumes the government intends to argue that Merida's actions violated Tex. Transp. Code Ann. § 544.004, which requires the driver of a vehicle to comply with traffic-control devices such as a "left lane for passing only" sign.

approximately 10 to 12 seconds after passing Trooper Francis' parked vehicle.  Trooper

Francis' testimony is corroborated by video evidence from his dashboard camera.  Although

Rittingger testified that Merida pulled into the left lane when he saw Trooper Francis' parked

vehicle—both because he believed that Texas law required him to do so and because he

believed it was safer to do so in case Trooper Francis opened his door into traffic—the court

finds that Rittingger's testimony is not credible.  Moreover, even if Merida had initially

pulled into the left lane to avoid Trooper Francis' parked vehicle, he did not immediately

return to the right lane after passing Trooper Francis.  Accordingly, the government

established that Trooper Francis had reasonable suspicion to effect a traffic stop of the BMW

on the basis that Merida was violating Texas law—§ 544.004 of the Texas Transportation

Code—by driving in a left lane reserved for passing.

      The government also proved that Trooper Francis had reasonable suspicion to stop the

BMW based on his observation that a GPS holder was attached to the front windshield in a

position that he believed was blocking the operator's clear view.  Under Tex. Transp. Code

Ann. § 547.613(a), it is a misdemeanor for a "person operat[ing] a motor vehicle [to have]

an object or material that is placed on or attached to the windshield . . . that obstructs or

reduces the operator's clear view."  Trooper Francis testified that, while he was following

the BMW, he observed a GPS holder attached to the windshield near the driver's head.  He

also testified that, as he approached the BMW after it stopped, he saw either the driver or the

passenger move the GPS holder closer to the middle of the windshield.  Although Rittingger

testified that the GPS holder was not blocking Merida's view, the court finds that

Rittingger's testimony is not credible.  Moreover, in determining whether Trooper Francis had reasonable suspicion to stop Merida based on a suspected violation of Tex. Transp. Code Ann. § 547.613(a), the court assesses whether Trooper Francis had a basis for his belief that justified the stop; the question whether Merida's view was actually obstructed or reduced by the GPS holder does not control whether Trooper Francis had a reasonable suspicion that the GPS holder was positioned in a way that violated § 547.613(a).

Accordingly, the government proved that the initial stop of the BMW was justified based on Trooper Francis' reasonable suspicion that Merida was driving in a left lane reserved for passing, and was operating the vehicle with an obstructed view, in violation of Texas law.

### IV

Under *Terry*'s second prong, that the government has established by a preponderance of the evidence that Trooper Francis' actions after stopping the BMW were reasonably related to the circumstances that justified the stop.

### A

Under the second prong of *Terry*, the court asks whether Trooper Francis' actions after stopping Merida's vehicle "were reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop." *Brigham*, 382 F.3d at 507.  "An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable

suspicion of additional criminal activity in the meantime." *United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010), *modified on other grounds*, 622 F.3d 383 (5th Cir. 2010); *see also United States v. Spears*, 636 Fed. Appx. 893, 901 (5th Cir. 2016) ("The time reasonably required to complete the mission of issuing a traffic ticket can include the time it takes to inspect the driver's license, automobile registration, and proof of automobile insurance; run computer checks; determine whether there are outstanding warrants against the driver; and ask the purpose and itinerary of the trip." (citing *Rodriguez v. United States*, ___ U.S. ___ , 135 S.Ct. 1609, 1615 (2015); *Pack*, 612 F.3d at 350)). If, however, "the officer develops reasonable suspicion of additional criminal activity, . . . he may further detain [the] occupants [of the vehicle] for a reasonable time while appropriately attempting to dispel this reasonable suspicion." *United States v. Andres*, 703 F.3d 828, 833 (5th Cir. 2013) (alterations in original) (quoting *Pack*, 612 F.3d at 350). As explained above, "[r]easonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). "The determination . . . must be made based on the totality of the circumstances and the collective knowledge and experience of the officers." *Id*. at 631-32 (citation omitted).

B

Rittingger contends that there was no basis for Trooper Francis to extend the permissible scope of the initial traffic stop. The government responds that Trooper Francis had reasonable suspicion that Merida and Rittingger were involved in criminal activity *other*

*than* the traffic violations, and that Trooper Francis was justified in briefly extending the traffic stop in order to ask Merida if he had any drugs in the vehicle and to ask for consent to search the vehicle.  Trooper Francis had extensive training, education, and experience in narcotics interdiction, including a little more than three years as a DPS Trooper working highway interdiction; Interstate Highway 40, on which Merida and Rittingger were traveling, is a well-known drug trafficking corridor; Merida and Rittingger exhibited signs of nervousness, including Merida's continually putting his foot on the brake pedal while he looked for his car insurance, leaving the driver side door open when he exited the vehicle, and approaching Trooper Francis and opening his wallet, and Rittingger's opening the passenger side door, stepping out, and staring at Trooper Francis' vehicle while Trooper Francis was talking to Merida and doing a computer check; Merida and Rittingger told inconsistent stories about the details of their travel; Merida stated that he and Rittingger had recently purchased the vehicle in New Mexico, but Merida did not know in what city; the vehicle was registered to, and insured by, a third party who was not a passenger in the vehicle, and Merida and Rittingger had no record of the purchase; Merida stated that the vehicle was purchased in New Mexico even though it had an Illinois license plate; Rittingger stated that they were traveling from El Paso to Dallas, but they were far off track and did not have a credible explanation for why; and the BMW had been recently buffed and painted, and Trooper Francis knew from his training and experience that vehicles that contain compartments to transport narcotics are frequently painted or altered to hide the compartment.

C

If, during a lawful traffic stop, an officer develops reasonable suspicion of additional criminal activity, he may further detain the occupants of the vehicle for a reasonable time while attempting to dispel this reasonable suspicion.  *Andres*, 703 F.3d at 833.  The government proved by a preponderance of the evidence that Trooper Francis developed reasonable suspicion of additional criminal activity during the initial stop.  It also proved that, after issuing the warning to Merida, he detained Merida and Rittingger for a reasonable time—a matter of moments—until Merida gave him consent to search the BMW.

At the suppression hearing, Trooper Francis testified regarding his extensive experience in narcotics interdiction, including 85 traffic stops that have resulted in the seizure of narcotics.  He also testified that Interstate Highway 40 is a well-known drug trafficking corridor and that he has made numerous stops resulting in the seizure of narcotics there.  Trooper Francis testified that Merida, as the driver of the vehicle, exhibited several signs of nervousness, including repeatedly pressing on the brake pedal when the BMW was parked, leaving the driver side door open to oncoming traffic when he exited the vehicle, and approaching Trooper Francis and showing him his wallet.  Trooper Francis testified based on his experience that he believed that these actions showed that Merida was distracted and focused on something other than the traffic violation.  Trooper Francis also testified that he observed that the BMW was an older model vehicle with substantial saltwater damage, but that it had been freshly painted.  He testified that the vehicle was insured by and registered to Leonardo Rodriguez, a third party who was not in the vehicle, that the vehicle had Illinois

plates even though Rittingger stated that it had recently been purchased in New Mexico, and that neither Rittingger nor Merida had any proof of ownership, even though they claimed to have both purchased the car just hours before.  Finally, Trooper Francis testified that Merida and Rittingger gave inconsistent stories about where they were coming from and where they were traveling to, and Rittingger failed to provide a credible explanation for why they were so far off track.

The facts in this case are similar to those in *Pack*, 612 F.3d at 361-62, in which the Fifth Circuit held that reasonable suspicion sufficient to support a 35-minute investigatory stop was created by the defendant's extreme nervousness, conflicting stories, and the fact that he was traveling along a trug trafficking corridor.  *Id.*  In reaching its conclusion, the court gave "significant weight" to the detaining officer's suspicion, noting that "he had been a law enforcement officer for seventeen years."  *Id.* at 361.  As to the allegedly suspicious facts the detaining officer observed, the court held:

> [w]hen the occupants of a vehicle are nervous and tell such irreconcilable stories to the police, the number of likely explanations for their conduct is limited. . . .  Considering the large volume of contraband that is moved along our major highways on a daily basis, especially in border states like Texas, a reasonable officer could fairly conclude that the most likely single alternative explanation, for the nervousness and irreconcilable stories raising reasonable suspicion of some criminal activity, is that the occupants are carrying contraband, particularly when the stop occurs on a highway that is frequently used by smugglers.  Therefore, we think that it is reasonable for an officer confronted with such conduct to detain the occupants for a reasonable amount of time to investigate the possibility that they are carrying contraband.  Worley testified that Pack's extreme nervousness, the irreconcilable stories, and the location

> of the stop immediately caused him to suspect drug activity.
> Accordingly, he investigated the possibility that Pack and
> Williamson were smuggling drugs by requesting permission to
> search their vehicle and calling in a canine unit when permission
> was denied.  We hold that Worley's decision to investigate the
> possibility of drug trafficking was reasonable, because drug
> trafficking provided a reasonably likely explanation for the
> suspicious facts that he had observed.

*Id.* at 362.

Here, as in *Pack*, Merida and Rittingger were traveling along a drug trafficking corridor, they gave Trooper Francis inconsistent (if not conflicting) stories about where they were coming from and what their final destination was, and they exhibited several indicators of nervousness.  In addition, Trooper Francis observed that the BMW had been recently buffed and painted, was registered to a third party owner, and had Illinois licence plates, even though Merida and Rittingger stated that they purchased it the day before in New Mexico. These facts, which Trooper Francis observed while effecting a lawful traffic stop of reasonable duration, created reasonable suspicion that additional criminal activity was afoot. Trooper Francis was therefore entitled to detain Merida and Rittingger for a reasonable time while attempting to dispel this reasonable suspicion.  And within moments of initiating that process—i.e., after issuing the warning to Merida—he secured Merida's consent to search the BMW.  "A search conducted pursuant to consent is excepted from the Fourth Amendment's . . . requirements."  *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002).  Accordingly, the court holds that Rittingger's Fourth Amendment rights were not violated.

V

Rittinger next contends that any consent given by Merida to search his vehicle was involuntary, and that it was unreasonable, given Merida's difficulty communicating in English, for Trooper Francis to assume that the consent was voluntary.

A

Where the government asserts that no search warrant was required because the officer obtained voluntary consent for the search, the government must prove by a preponderance of the evidence that consent was freely and voluntarily given. *United States v. Tompkins*, 130 F.3d 117, 121 (5th Cir. 1997). Whether "consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973).

> In evaluating the voluntariness of consent, [the Fifth Circuit] look[s] to six factors: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Cavitt*, 550 F.3d 430, 439 (5th Cir. 2008). No single factor is dispositive or controlling. *Solis*, 299 F.3d at 436.

The court finds and concludes that the first factor weighs in favor of the government because Merida was not in custody when Trooper Francis requested consent to search the

BMW.  Trooper Francis had issued a warning to Merida and had returned all of his documents (driver license and proof of insurance) to him, and Merida was free at that time to go.

As for the second factor, there is no evidence that Trooper Francis used coercive tactics or that he took unlawful advantage of the situation to obtain Merida's consent.  The stop began as a routine traffic stop.  Trooper Francis and Merida essentially communicated throughout in polite terms.  Merida was not handcuffed, no threats or violence was used, and there was no overt display of authority.  Trooper Francis at no time before arresting the defendants acted in an intimidating manner or even raised his voice.  The absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of upholding what appears to be a voluntary consent.  *See United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973).  In addition, during the search itself, Merida and Rittinger were not handcuffed, were permitted to visit with each other and walk around the vehicle, and were even permitted to enter the vehicle to get a drink.

Regarding the third factor, Merida was cooperative as he answered Trooper Francis' questions, and he caused no problems.  He verbally (in words) and non-verbally (through a nod of his head) consented when Trooper Francis asked for his consent to search the BMW, and he admitted in his factual resume that "Trooper Francis asked [him] for consent to search the vehicle and [he] voluntarily consented to the search."  Gov't Ex. 2 at 2.  Moreover, Merida never revoked his consent even as Trooper Francis increased the intrusiveness of the search and moved beyond the luggage that was in the trunk of the BMW to the interior rear-seat area.

For the fourth factor, there is no indication in the record that Merida was aware of his

right not to consent.  But Trooper Francis did ask Merida for his consent in a manner that suggested that such consent was needed.  And there is no absolute requirement that the government establish that Merida knew he could refuse; it is merely one of the factors.  *See Schneckloth*, 412 U.S. at 227 ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent."); *see also Davis*, 749 F.2d 292, 296 (5th Cir. 1985) ("Proof of knowledge of the right to refuse consent is not required to show voluntariness.").

Concerning the fifth factor, there is no evidence that Merida had a limited education or was of below average intelligence.  To the extent that Rittingger contends that Merida was unable to understand Trooper Francis' request for consent to search the vehicle, the court rejects Rittingger's argument.  Trooper Francis testified that he was able to communicate with Merida using English and Spanish, and video evidence from Trooper Francis' dashboard camera corroborates his testimony.  For example, Merida understood Trooper Francis' request that Merida produce identification and proof of insurance and his request that Merida sit in Trooper Francis' patrol vehicle.  Merida also admitted in his factual resume that he voluntarily consented to the search.

Finally, with respect to the sixth factor, given that the drugs were well-hidden in the BMW, it is likely that Merida believed that Trooper Francis would not find any incriminating evidence.  *See United States v. Cooper*, 43 F.3d 140, 148 (5th Cir. 1995) (holding that sixth factor weighed in favor of voluntariness of consent to search where defendant "probably did not think [officer] would be able to locate the drugs by the pat-down, much less identify the

package as containing crack cocaine.").

Taking all six of the factors into consideration, the court finds and concludes that Merida's consent was voluntary and valid.

B

To the extent Rittinger maintains that Trooper Francis was required to obtain Rittinger's consent to search the BMW based on Rittinger's telling Trooper Francis that he had purchased the vehicle, the court rejects this argument.

Assuming *arguendo* that Rittinger was the owner of the BMW, for the search to be valid pursuant to *Merida*'s consent, the government is required to prove that Merida had actual or apparent authority to consent to a search. *United States v. Jaras*, 86 F.3d 383, 389 (5th Cir. 1996). A "finding of actual authority requires proof that the consenting party and the party challenging the search 'mutually used the property searched and had joint access to and control of it for most purposes.'" *Id.* (quoting *United States v. Rizk*, 842 F.2d 111, 112-13 (5th Cir. 1988) (per curiam)); *see also Solis*, 299 F.3d at 436 ("In the context of searches, it is well established that the police may conduct a warrantless search of an area without running afoul of the Fourth Amendment if a third party with common control over the area consents to the search." (citation omitted)). It is undisputed that, as the driver of the vehicle, Merida mutually used the vehicle and had joint access and control for most purposes. Accordingly, Merida had actual authority to consent to a search of the BMW.

- 23 -

*     *     *

To summarize, the government established by a preponderance of the evidence that the traffic stop was justified at its inception.  Trooper Francis' actions from the time he effected the stop until he issued the warning to Merida were reasonably related in scope to the circumstances that justified the stop.  By the time he issued the warning, he had developed reasonable suspicion of additional criminal activity, at which point, almost immediately after issuing the warning, he asked Merida for consent to search the BMW, and Merida gave his consent.  The government established by a preponderance of the evidence that Merida's consent was voluntary.  The court therefore denies Rittingger's motion to suppress.

**SO ORDERED**.

January 25, 2017.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE